SOUTHWEST INDUSTRIAL PRODUCTS, INC., A Corporation, Plaintiff in Error,

v.

G. B. ENTZ, Defendant in Error.

No. 39575.

Supreme Court of Oklahoma.

Nov. 13, 1962.

Rehearing Denied Dec. 11, 1962.

LeRoy Powers, Delmer L. Stagner, Stagner, Alpern, Powers & Tapp, Oklahoma City, for plaintiff in error.

Smith, Leaming & Swan, Oklahoma City, for defendant in error.

BLACKBIRD, Vice Chief Justice.

In this action instituted by defendant in error, hereinafter referred to as plaintiff, he sought an accounting of such sums as due him under arrangements with plaintiff in error, hereinafter referred to as defendant, whereby said defendant corporaration, among other things, purchased, and was to pay him for, patent rights for certain equipment related to stone cutting.

The defendant corporation was organized, as contemplated in negotiations between plaintiff and a Mr. McCandless, to purchase two companies, plaintiff controlled, by the names of "Southwest Industries, Inc.", and "Industrial Products, Inc.", and, in whose names he had been manufacturing and marketing the articles covered by the patents.

The original "Purchase Contract" between plaintiff and defendant, dated November 20, 1956, provided generally that defendant would take over the manufacturing and marketing under said patents, and that it would pay plaintiff, for his assignment to it of the patents and all rights

thereunder, a royalty of 10% of the "gross sales" of all machines and parts sold by it, its agents or assigns, until the sum of $136,-000.00 had been paid; and it further provided that thereafter, and until September 11, 1973, the royalty would be 2½% of "gross sales".

In said contract's paragraph "3", defendant agreed to keep records reflecting all such sales, and agreed that said records, and/or books, would be open to inspection by plaintiff, his agents or assigns. The contract's paragraph "5" provided that, within two months after the closing of its books at the end of each fiscal year, defendant would render plaintiff a full statement of the gross sales upon which such royalties were payable, and would pay him all accrued and unpaid royalties. By an ancillary contract, defendant agreed that it would also pay plaintiff a commission of 10% on all of the patented articles he sold for it, and, among other provisions of the purchase contract, its paragraph "7" provided:

> "Gross sales as used herein *shall be based on billings made by th corporation,* less returns when made, including collections from lease-purchase and rental contracts, and *royalty shall be predicated on actual collections, irrespective of any sales commissions* paid or due to be paid." (Emphasis ours.)

Thereafter, defendant supplemented its operating capital by making certain arrangements with two finance companies. The first of these arrangements was made with the Sequoyah Investment Company of Tulsa, and is evidenced by a letter dated October 25, 1957, which was modified by a subsequent letter dated January 9, 1958. Another and later arrangement was made with CIT Corp., evidenced by a letter from defendant to that corporation, dated August 3, 1958. The effect, if any, of the operation of these arrangements (which defendant refers to as "financing" agreements), on the operation of the above described Purchase Contract, and a later one superseding it on

February 1, 1959, and the amount of royalties, if any, to which plaintiff is entitled under each contract, is a major issue in the present controversy.

Defendant's position, in regard thereto, is that, in transferring to the finance companies, in return for their money, the promissory notes certain of its customers had executed and delivered to it in purchasing some of the patented equipment, it was merely entering into "loan" transactions, or "borrowing" money on the notes. Plaintiff contends, however, that these transactions constituted "actual collections" on "gross sales", as those terms were used in the above described Purchase Contract, and that, under said contract, he was entitled to royalty (at the rate provided in the contract) on said "collections" at the time they were made.

Another issue at the trial pertained to sales of machines, and/or equipment, in the closing of which sales defendant accepted from its customers, old machines and/or equipment, and allowed them credits therefor as "trade-ins", which credits were deducted from the billing price of the new equipment sold. Plaintiff contended that, under the original contract between the parties, such credits should be considered the equivalent of cash, in computing his royalty on "gross sales". On the other hand, defendant took the position that the total of the gross sales, on which plaintiff was entitled to royalty, should be reduced by the amount of such credits. Defendant further contended that plaintiff was entitled to no royalty on the re-sale of such "trade-ins", while plaintiff contended that he was so entitled. He conceded, however, that he was entitled to no royalty on such sales after the original contract was superseded by the later one of February, 1959.

Another question involved in the controversy pertained to the proper means of ascertaining the correct amount of plaintiff's royalty, on sales of patented articles, where, because of their purchasers' transportation of them, from defendant's plant, to their quarries or destinations, defendant, upon being relieved of this freight, or "hauling", expense, deducted the amount thereof from the price collected from said purchasers.

The only other disputed question involved (as far as this appeal is concerned) was whether or not plaintiff was entitled to the specified royalty on the sale of "End Cutters" and "Masonry Cutters".

Along with other evidence adduced at the trial, defendant, for the purpose of attempting to support its proposition concerning the meaning of the term "Gross Sales" as used in the original contract, elicited testimony from Mr. S (one of defendant's attorneys, stockholders and directors) contemplated to show certain conditions about the market for the patented articles, and circumstances pertaining to defendant's sale of them, at the time said contract was entered into. On motion of plaintiff, this testimony was stricken.

To support his position, plaintiff introduced certain documentary evidence, including copies of the defendant's income tax returns and a firm of accountants' annual audits of defendant's books to show that defendant, itself, had considered, as valid obligations, liabilities and/or expenses, some of the royalties plaintiff was seeking to collect.

At the close of the evidence, the trial court rendered judgment in plaintiff's favor, setting forth, in the journal entry thereof, its findings as to the principal phases of the controversy in separately numbered and entitled paragraphs.

Under paragraph "II", entitled "FINANCE CONTRACTS", the court found, in substance, that the term "gross sales" as it had been used, and interpreted, by the parties prior to November 1, 1959, included all amounts evidenced by " * * * lease purchase contracts, instruments, contracts or other deferred payment contracts"; and that royalties on sales made under such contracts were due and payable the same as if they had been cash sales. The part of the judgment based on this paragraph of the findings was the sum of

$9,902.35, with interest thereon at 6% per annum from November 1, 1959.

In the judgment's paragraph "III", entitled "TRADE-INS AND SALES OF MACHINES ACQUIRED AS TRADE-INS", the court found that under the parties' contracts of November 20, 1956, and February 1, 1959, allowances for trade-ins should be treated as cash, in determining the royalties due plaintiff; and that, under the first of these contracts, unpaid royalty in the sum of $2,900.00 had accrued to plaintiff by November 1, 1958, on sales of such trade-ins. The judgment for plaintiff on account of that item was in said amount, plus interest thereon at 6% per annum from said date.

In the judgment's paragraph "VI", entitled "HAULING ALLOWANCES", the court found that the term "gross sales", as used in the contract between the parties, included the credits defendant had deducted from the billing prices of patented articles, on account of said customers having paid the hauling, or freight, costs on said articles at the time of their purchases; and that plaintiff was entitled to royalty of $90.00 on the total of such deductions, with interest at 6% per annum from May 31, 1959.

In the judgment's paragraph "V", entitled "END CUTTERS AND MASONRY CUTTERS", the court found that the parties had intended that plaintiff should receive royalty on the gross sales of all end cutters and masonry cutters sold by defendant; that the parties had, by their conduct, so construed their contracts; and that there was due plaintiff from defendant, as of May 31, 1959, the sum of $250.00 for this item, with interest thereon at 6% per annum from said date.

Defendant's argument for reversal of the trial court's judgment is advanced under seven propositions.

■ Under its "Proposition I", it calls our attention to the fact that the hereinbefore mentioned contract plaintiff and defendant entered into on February 1, 1959, contains the express provision that: " * *

No royalty shall be payable upon (the) sale of traded-in machines, nor on any parts used therein * * *", and to the provision therein, that said contract superseded the previous "Purchase Contract", and that the royalty theretofore paid under the Purchase Contract should be " * * * credited toward payment of the total royalty obligation." Defendant contends that, as a matter of law, the parties' making of the 1959 contract prevents any recovery by plaintiff under the earlier one. We do not agree. The rule, for which defendant cites 12 Am.Jur., "Contracts", section 457, as the basis for its said contention, is dependent, for its application, on the intention of the parties. See the Annotation at 24 A.L.R. 253, 256 ff. Here, there is no adequate proof that, by entering into the 1959 contract, plaintiff and defendant intended to obviate payment of any royalties that had accrued under the 1956 Purchase Contract.

■ Under its "Proposition V", defendant contends that the court erred in the hereinbefore described paragraph III of its judgment. Defendant's position is that the court's decree that plaintiff was entitled to royalty on that part of the sale prices of new machines, defrayed by the trade-in allowances on the used machines taken in on them, as well as royalty on the subsequent sale of said traded-in machines, gives plaintiff "double royalty" on the same articles, resulting in an accelerated obligation to pay plaintiff, was never contemplated, nor intended, by the parties at the time they entered into the 1956 contract. Plaintiff, on the other hand, emphasizes the fact that the contract made the royalty payable on "gross", rather than on "net", sales; and that the payment of the royalty therein prescribed did not depend on defendant's profits on the sales. He further points out that the evidence indicates that used machines traded in on new ones were thereafter rebuilt before being resold, and presumably then sold for a sum greater than their previous trade-in allowance or value. Defense counsel say that the fact that there was a

provision in the 1959 contract obviating payment of royalty on the sale of machines previously traded in, indicates that this was also the intention of the parties when they entered into the original contract. We do not agree. We think the writing into the later contract of the provision obviating payment of royalty on the sales of trade-ins may just as logically indicate the contrary, viz., that royalty on such sales was payable under the earlier contract, and that, consequently, the parties had an understandable reason for making it definite, by express provision, in the later contract, that no such royalty was to be paid under it. On the basis of the evidence, we find defendant's arguments concerning paragraph III of the trial court's judgment insufficient to demonstrate error therein.

Defendant's arguments under its Propositions II, III, and IV, all pertain to alleged errors of the trial court in connection with its allowing plaintiff royalty on defendant's gross sales, without regard to the fractional parts of the billing prices of the articles included in the total gross sales, that were "financed", or represented by promissory notes. Defendant argues that the court's finding that royalty on these sums was due and payable, the same as on the cash part of these sales, ignores the fact that under defendant's afore-mentioned contracts with the two finance companies, the latter took the promissory notes with recourse, so that defendant could be required to take back the notes, pay back the money received from the finance companies for them, and repossess the machines, if the customers, liable on said notes, did not pay them.

■ Defendant recognizes that there was no positive proof as to whether or not there was any specific understanding between the parties—other than the wording of their contract—as to whether royalty was to be paid, before collection of the notes, on the portions of the sales represented by said notes; but it contends that the court erred in striking, on plaintiff's motion, as aforesaid, the testimony of Mr. S, which defendant says indicated what the parties intended, by showing some of the circumstances existing at the time the purchase contract was entered into. The latter alleged error is not before us for review, since, insofar as the record shows, defendant took no exception, nor made known any objection to the trial court's sustaining of plaintiff's motion to strike said testimony. In this connection, see Tit. 12 O.S.1961 § 630; McMillan v. Lane Wood & Company, Okl., 361 P.2d 487; Colorado Interstate Gas Co. v. Lorenz, Okl., 330 P.2d 583.

■ Defense counsel further argue that defendant's aforementioned income tax returns and annual audits were not sufficient evidence to support the court's interpretation of the term "gross sales" as used in the contract, especially in view of the contract's provision that " * * * royalties shall be predicated on actual collections * * *". They also argue that plaintiff's acceptance of royalty payments over a considerable period of time, without demanding royalty on the "financed" part of the sales, is strong evidence that the parties, themselves, considered that there was no such royalty due until the financed sales had been fully paid for by the vendees of the articles. Plaintiff, on the other hand, points out that in receiving these royalty payments, he accepted them "subject to audit", and says he was unable to obtain a thorough audit of defendant's records, and thus ascertain whether or not he had been paid the correct amount, until after he had filed this action, and obtained an order from the trial court opening defendant's records to his inspection. We have carefully examined the record and find no basis therein for holding that the findings and judgment of the trial court as to this phase of the case is either without sufficient support in, or is clearly against the weight of, the evidence.

As defendant has failed to demonstrate herein any cognizable ground for reversing any part of the trial court's judgment, the same is hereby affirmed.

WILLIAMS, C. J., and WELCH, DAVISON, HALLEY, JOHNSON, JACKSON and IRWIN, JJ., concur.